IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| ARTHUR ROBERTS, JR., )<br>    )<br>    Plaintiff, )<br>    )<br>    v. )<br>    )<br>STATE OF ALABAMA )<br>DEPARTMENT OF YOUTH )<br>SERVICES and GEORGE )<br>McCREE, in his individual )<br>capacity, )<br>    )<br>    Defendants. ) | CIVIL ACTION NO.<br>2:13cv335-MHT<br>(WO) |

OPINION

Plaintiff Arthur Roberts, Jr. brings this lawsuit against his former employer, defendant State of Alabama Department of Youth Services (DYS), and his DYS supervisor, defendant George McCree.  Roberts charges DYS with religious discrimination and retaliation in employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a & 2000e through 2000e-17.  He also sues McCree in his individual capacity, charging a violation of the Fourteenth Amendment's Equal Protection Clause, as

enforced through 42 U.S.C. § 1983.  The court has jurisdiction over Roberts's claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

This cause is before the court on DYS and McCree's motion for summary judgment.  Summary judgment will be granted in part and denied in part for DYS.  Summary judgment will be granted in full for McCree.


I.  SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in favor of that party.  <u>Matsushita Elec. Indus. Co.
Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Roberts, an ordained minister, volunteered his pastoral services while a DYS employee.  Roberts charges that McCree, the DYS Campus Chief of Security at Mt. Meigs correctional facility, discriminated against him because of his religious practices and then retaliated against him after he filed an administrative charge with the Equal Employment Opportunity Commission (EEOC) on the basis of this discrimination.  The facts that follow are drawn from the evidence taken in the light most favorable to Roberts.

Roberts was hired by DYS as a probationary-status Youth Services Security Officer in the fall of 2011. He was assigned to the Mt. Meigs juvenile correctional facility.  In accordance with departmental policy, all employees must first serve an initial probationary period of six months, after which probation may be

3

extended at departmental discretion before a final decision is made regarding permanent employment status.

Roberts had some minor competence and disciplinary issues during his first few months on the job. For example, he failed his first "control tactics" training, though he re-tested and passed on his second try; at one point, he was reprimanded for using his personal cell phone on campus; and he received one formal "counseling" letter for failing to submit an incident report. However, he did not receive any formal disciplinary sanctions. Near the end of the six months, he received a "meets standards" probationary performance appraisal score of 24 out of 40. His work habits, including attendance, punctuality, cooperation, and compliance with rules, were all considered "satisfactory."

Within his first few months at DYS, Roberts notified his supervisor and other administrators that he was an ordained minister and that he wished to provide volunteer pastoral services to the facility's

young men.  After speaking with the campus chaplain and after a conference call with McCree and one of the facility directors, Roberts was authorized to administer pastoral services in his off-hours.  He was scheduled to begin providing services once a month, on Sunday.

McCree expressed displeasure at Roberts's interest in the ministry, and he ridiculed him about his religious activity.  McCree would tease Roberts with comments such as, "preaching the word today, Minister?" and "You going to get some saved today, ain't you, Preacher?"  Roberts Test. (doc. no. 37-2), at 8-9. Roberts took these comments to be derogatory.  McCree also told Roberts not to "come out here with that preaching shit to these kids" because "they don't want to hear it," and McCree stated to another employee, "How in the world is that man [Roberts] going to come out here and preach, when he can't perform his job he

was hired to do[?]".   EEOC Statement from Frankie
Knight (doc. no. 40-1) at 12.[1]

Throughout this period, according to Roberts,
McCree also subjected him to general ridicule and
harassment.   For example, after Roberts got two
department vehicles stuck in the mud, McCree assigned
him a vehicle with no working air conditioner.   On
another occasion, McCree gave him a hard time about his
shoes, after Roberts had received a compliment from a
co-worker that his shoes shined.

On April 10, 2012, Roberts called in sick and
reported his absence to the gate administrator.   McCree
chastised Roberts for not also calling a supervisor, as
was proper procedure, and requested that Roberts's
leave be taken without pay.

A few days later, McCree recommended that Roberts's
probation be extended for three months.   McCree

---

1. DYS and McCree have moved to strike the evidence
produced by Roberts regarding these statements
recounted by Frankie Knight in his interview with the
EEOC.   In a separate order issued on this same date,
the court denies this motion.

reported that, before a final recommendation could be made regarding Roberts's employment status, Roberts needed additional time to improve "time and attendance, use of security equipment and vehicles, and reporting writing." Probationary Extension Request (doc. no. 37-2) at 21. The extension request was approved.

On May 23, 2013, Roberts filed in administrative charge with the EEOC, alleging that McCree had bullied, intimidated, and harassed him on the basis of his religion. Sometime shortly after Roberts filed his EEOC charge, McCree told Frankie Knight, another employee, that he had heard that Roberts had filed an EEOC charge against him and that, if it was true, he (McCree) "was going to fire his ass." July 11 Evidentiary Hearing Tr. (doc. no. 58) at 33:17-23.

On June 20, 2012, McCree submitted a recommendation to terminate Roberts's employment, stating: "Roberts failed to demonstrate that he can work in his role as a [Security Police Officer] comfortably without being instructed on a routine basis as to what he

7

procedurally should do to maintain compliance with the
existing role and responsibilities of a Security Police
Officer and the agency." Request for Probationary
Termination (doc. no. 37-2) at 23. The next day,
McCree spoke to Roberts in his office, explaining that
Roberts could choose to resign or be terminated.

Roberts resigned June 22, 2012, explaining, in his
letter of resignation, that conditions at work had
become unbearable for him "before, during, and after"
McCree learned of the EEOC complaint and that McCree's
"personal vendetta" left him no choice but to resign.
Letter of Resignation (doc. no. 41-3), at 11.

Roberts then brought this lawsuit against DYS and
McCree.


### III. DISCUSSION

#### A. Title VII

Title VII bars an employer from discriminating
against an employee "with respect to his compensation,
terms, conditions, or privileges of employment, because

**8**

of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation against an employee because he opposed an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). Roberts charges DYS with religious discrimination and retaliation, in violation of Title VII. DYS seeks summary judgment on both claims.

## 1. Religious-Discrimination Claim

Roberts's religious-discrimination claim is that DYS subjected him to a hostile-work environment due to his religious practices. "A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)

9

(internal citations omitted).   To prove a religion-based hostile-work environment, Roberts must show: (1) that he has been subject to unwelcome harassment; (2) that the harassment must have been based on his religious practices; (3) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (4) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.   Cf. id. (setting forth these factors for a race-based claim); MackMuhammad v. Cagle's Inc., 379 F. App'x 801, 805 (11th Cir. 2010) (adapting Miller to a religion claim).   DYS primarily argues that Roberts has failed to establish the third element: that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment or create a discriminatorily abusive working environment. The court agrees.

Whether harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of employment is evaluated both objectively and subjectively.  <u>Miller</u>, 277 F.3d at 1276; <u>see also</u> <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22 (1993).  "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." <u>Miller</u>, 277 F.3d at 1276 (internal citations omitted). In evaluating the objective severity of harassment, the court must consider the totality of the circumstances, including factors such as: "the frequency of the conduct"; "the severity of the conduct"; "whether the conduct is physically threatening or humiliating, or a mere offensive utterance"; and "whether the conduct unreasonably interferes with the employee's job performance."  <u>Id</u>.

Considering the totality of the circumstances, McCree's alleged disdain for Roberts's religious

practices did not create an objectively abusive-work environment. McCree made several offhand, disparaging comments to Roberts about his ministering activities, and he expressed disapproval over Roberts's volunteer pastoring with the young men at the facility. However, Roberts's evidence of ridicule does not amount to conduct beyond "mere offensive utterance[s]." Miller, 277 F.3d at 1276. McCree did not attempt to impede Roberts's religious practice, nor did he threaten Roberts in any way. Nor does Roberts mention more than a handful of comments made over several months. Cf. id. (contrasting "occasional off-color comments" with derogatory racial slurs "[used] in an intimidating manner," and finding the latter actionable); McCann v. Tillman, 526 F.3d 1370, 1379 ("sporadic and isolated" offensive and derogatory race-based comments not sufficient to establish that employer conduct was objectively severe and pervasive).

While Roberts alleges that he was made to feel humiliated, much of McCree's personal animus seems to

12

be entirely unrelated to religion. And he offers no evidence to interpret the more degrading incidents--such as assignment to a vehicle without air conditioning or ridicule about one's shoes--as related to his religion. Nor does Roberts present evidence that the harassment interfered with his job performance. To the contrary, Roberts testified that, while he felt "picked on," he did not "let it deter me from doing the job that I was hired to do." Roberts Test. (doc. no. 37-2), at 5.

While McCree's conduct was certainly disrespectful, it does not meet the standard for objective severity to be actionable under Title VII. Title VII is not a "general civility code" and does not protect against "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [religion]-related jokes, and occasional teasing," <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (internal citations omitted), as McCree engaged in here. Therefore, Roberts's hostile-work-environment claim

fails, and the court need not proceed to examine the subjective component or the remaining elements of the claim.

## 2. Retaliation Claim

Title VII prohibits not only discrimination, but retaliation. An employer cannot retaliate against an employee because he has opposed any practice made an unlawful employment practice by Title VII or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing thereunder. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

In this case, Roberts filed an EEOC charge against McCree based on religious discrimination. According to Roberts, after McCree learned about the EEOC charge against him, he retaliated in two ways: first, he recommended that Roberts be terminated; and, second, he

forced Roberts to resign.[2]   The court will address each in turn.

To make out a prima-facie case of retaliation, a plaintiff must show: (1) that he engaged in an activity protected under Title VII; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. <u>Kidd v. Mando Am. Corp.</u>, 731 F.3d 1196, 1211 (11th Cir. 2013).   For the purposes of a retaliation claim, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   <u>Burlington N. & Santa Fe</u>

---

2. Around the same time that Roberts filed his EEOC charge, McCree switched Roberts from his second shift to the third, overnight shift.   Roberts argues that McCree switched him to the third shift in retaliation for the EEOC charge.   However, internal DYS correspondence suggests that the change already had been set on the day before Roberts filed his EEOC charge.   <u>See</u> DYS Memorandum (doc. no. 50-11), at 9 (dated May 22, 2012).   Because Roberts has not offered any admissible evidence to the contrary, Roberts's argument fails on this point.

_Ry. Co. v. White_, 548 U.S. 53, 68 (2006) (internal citations omitted).

There is no question that, by filing a Title VII administrative charge, Roberts engaged in a protected activity.  There is also no question that both retaliatory acts alleged by Roberts--the recommendation to be terminated, and being given an ultimatum to resign or be fired--meet the standard for "materially adverse actions" set forth by _Burlington_.  The court will therefore turn to whether Roberts can demonstrate the required causal connection for each adverse action.

The Supreme Court has recently established the evidentiary burden required for a plaintiff to prove causation in retaliation cases.  In _University of Texas Southwestern Medical Center v. Nassar_, 570 U.S. ---, 133 S.Ct. 2517 (2013), the Supreme Court adopted a traditional causation standard: plaintiffs must prove that the retaliatory motive was the 'but-for' cause of the adverse employment action.  _See id_. at 2533 ("Title VII retaliation claims must be proved according to

16

traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C.] § 2000e-2(m)," the substantive antidiscrimination provision).

Roberts's co-worker, Frankie Knight, testified that McCree told Knight that he had heard that Roberts had filed an EEOC charge against him and that, if it was true, he "was going to fire his ass." July 11 Evidentiary Hearing Tr. (doc. no. 58), at 33:17-23. While McCree did not himself have the power to fire Roberts, it is uncontested that McCree's recommendation regarding Roberts's employment status would have some influence on the ultimate decisionmaker. July 11 Evidentiary Hearing Tr. (doc. no. 58), at 41:11-43:20. It is also uncontested that within a month after Roberts filed his EEOC charge, McCree did indeed recommend Roberts's termination.

DYS argues that McCree's recommendation to terminate Roberts was in fact caused by his disciplinary and competence issues, rather than as retaliation for filing an EEOC charge. However,

**17**

Knight's testimony that McCree intended to "fire [Roberts's] ass" if he had filed an EEOC charge certainly presents a genuine issue of material fact regarding the but-for cause of McCree's unfavorable recommendation.  Contrary to DYS's argument, the but-for cause of a challenged employer action need not be the <u>sole</u> cause of the action.

To demonstrate that a plaintiff's protected activity was the but-for cause of retaliation, the plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  <u>Nassar</u>, 133 S.Ct. at 1533.  Yet McCree's retaliatory intent may still constitute a but-for cause even if it "combines with other factors to produce the result, so long as the other factors alone would not have done so--if, so to speak, it was the straw that broke the camel's back.  Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those

diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." Burrage v. United States, 571 U.S. ---, 134 S.Ct. 881, 888 (2014) (explaining but-for causation and citing Nassar).

It may be true that other factors concerning Roberts's competence combined with McCree's retaliatory animus when he made the recommendation to fire Roberts. However, Roberts has presented sufficient evidence of retaliation to survive summary judgment, because Knight's testimony creates a genuine issue of material fact as to whether the EEOC charge was "the straw that broke the camel's back." Id.

The court next turns to the forced-resignation retaliation claim. One day after submitting his recommendation that Roberts be terminated, McCree called Roberts into his office, notified him of the negative recommendation, and gave him the choice to resign or be fired. Roberts resigned the next day, citing the fallout from the EEOC charge and the impact

of McCree's "personal vendetta."  Letter of Resignation
(doc. no. 41-3), at 11.

For the same reasons discussed above, because
McCree counseled Roberts to resign on the basis of his
negative recommendation and because DYS has not
presented any evidence of intervening or superseding
causes to which it could attribute Roberts's
resignation, Roberts has also presented a genuine issue
of material fact as to whether his EEOC charge was the
but-for cause of his forced resignation.[3]

---

3. In his complaint, Roberts argues that his forced
resignation amounted to a constructive discharge.
"Under the constructive discharge doctrine, an
employee's reasonable decision to resign because of
unendurable working conditions is assimilated to a
formal discharge for remedial purposes. The inquiry is
objective: Did working conditions become so intolerable
that a reasonable person in the employee's position
would have felt compelled to resign?" Pa. State Police
v. Suders, 542 U.S. 129, 141 (2004).

Construing the evidence in the light most favorable
to Roberts, the court agree that it is plausible that
McCree's recommendation to terminate Roberts and his
subsequent ultimatum--to resign or be fired--would have
compelled a reasonable employee to resign before such
termination became part of his permanent record.

(continued...)

DYS's motion for summary judgment on the retaliation claim is therefore denied.


## B. Section 1983

However, as the Eleventh Circuit has explained, it is "unnecessary" to determine whether Roberts was in fact constructively discharged for him to prevail on his retaliation claim. Kurtts v. Chiropractic Strategies Group, Inc., 481 F. App'x 462, 467 (11th Cir. 2012). See also Daugherty v. Warehouse Home Furnishings Distrib., Inc., 951 F. Supp. 2d 1275, 1279 (N.D. Ala. 2013) (Hopkins, J.) (discussing Kurtts). "To establish a prima facie case of retaliation, a plaintiff is not required to show an ultimate employment decision or substantial employment action." Kurtts, 481 F. App'x at 467. Rather, as already explained, if McCree's conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Roberts's retaliation claim may go forward. Burlington, 548 U.S. at 68 (internal citations omitted). Here, McCree's option to Roberts to resign or be fired would, by itself, constitute a materially adverse-employment action. Therefore, Roberts' failure to establish that he was constructively discharged would not diminish his retaliation claim, for there is still evidence to support that, in retaliation for his having filed an EEOC charge, he suffered the materially adverse-employment action of being given the option of either resigning or being discharged.

42 U.S.C. § 1983 allows an individual to sue for money damages when his federally protected rights have been violated by another individual acting under the color of state law.  In his original, first, and second amended complaints, Roberts brought a cause of action against McCree in his individual capacity under 42 U.S.C. § 1983, arguing that McCree violated his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

In his third and final amended complaint, while he still cited to the constitutional violation and redress by § 1983 in the first paragraph of the complaint and while, when describing the parties, he argued that McCree is liable under § 1983, Roberts no longer listed § 1983 as a separate cause of action, and he removed his factual discussion of the claim entirely.  In turn, McCree did not respond to, or even mention, Roberts's § 1983 claim in the motion for summary judgment, nor in the reply brief, though Roberts continued to argue for § 1983 relief in his summary-judgment briefing.  The

22

court is confused by what to make of Roberts's omission. Yet even under a liberal pleading standard, the district court need not "fabricate a claim that a plaintiff has not spelled out in the complaint." 5 C. Wright & A. Miller, Federal Practice & Procedure § 1286 (3d ed. 2004). Nor may the pleader "weave a net of refinements and technicalities in which to catch an unwary opposing litigant." Id.

"[U]nder the Federal Rules of Civil Procedure, an amended complaint supersedes the initial complaint and becomes the operative pleading in the case." Krinsk v. SunTrust Banks, Inc., 654 F.3d 1194, 1202 (11th Cir. 2011) (internal citations omitted). Therefore, because Roberts edited away the § 1983 cause of action from the final version of his complaint, after he had included it in three prior versions, and because he provided no notice to the court or McCree that such omission was inadvertent, Roberts has intentionally dropped his § 1983 claim. Roberts's attempt to raise the claim anew on summary judgment must fail. See Gilmour v.

23

<u>Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Therefore, because Roberts has no pending claim against McCree, McCree is entitled to summary judgment in his favor.

* * *

Accordingly, for the above reasons, the court holds that DYS is entitled to summary judgment in its favor on the religious-discrimination claim but is not entitled to summary judgment in its favor on the retaliation claim and that McCree is entitled to summary judgment in his favor in full. An appropriate judgment will be entered.

DONE, this the 11th day of February, 2015.

/s/ Myron H. Thompson
_____
UNITED STATES DISTRICT JUDGE